# Richmond.

## Nicholas v. Commonwealth.

### March 21, 1895.

1. Criminal Law—*Speedy Trial—Failure to Hold Term—Continuance.*—The statute guarantees a speedy trial to a person indicted for a felony by providing for his discharge from prosecution if four terms of the County Court in which he is held for trial elapse without a trial, unless the record shows that the case was continued for some one of the enumerated reasons therein set forth, but the fact that one term has passed without an order in the case is not a denial of a speedy trial. If the record fails to disclose that a term was held on the day appointed for it, none may have been held and the case would stand continued until the next term.

2. Criminal Law—*Circuit Court Jurisdiction—Power to Remand—Certification of Record by County Court.*—After a Circuit Court has acquired jurisdiction to try a prisoner, upon his election in the County Court, it has no power to remand the case to the County Court for any purpose whatever, not even on the motion of the prisoner himself, and an order so remanding it is a nullity. If the County Court has failed to certify any part of the record, the Circuit Court should have the record certified as the law directs.

3. Criminal Law—*Trial in Circuit Court— Venire Facias—List Furnished by County Court, or Judge thereof.*—For the trial of a felony in the Circuit Court, the writ of *venire facias* is properly issued by the clerk of said court, directed to the officer, requiring him to summon twenty jurors for such trial from a list to be furnished him by the court of such county, or the judge thereof in vacation, and a return of such officer showing these facts is a sufficient return.

4. Criminal Law—*Evidence—Possession by Accused of Instruments of Death.*—Where it is shown that a crime has been committed by the use of certain tools and instruments, it is always pertinent to show, as one element connecting the accused with the crime charged, that he possessed such tools and instruments.

5. CRIMINAL LAW—*Homicide—Antecedent Threats—Previous Attempts on Life of Deceased—Corpus Delicti—Circumstantial Evidence.*—On a trial for homicide, antecedent threats and previous attempts to take the life of the deceased are competent evidence both on the question of deliberation and of premeditation. And where it is shown that the deceased came to his death by drowning, while in company with the accused, it is competent to show that shortly theretofore the accused stated to the friends and relatives of the deceased that deceased had heart disease and was liable to die at any time. The *corpus delicti* was sufficiently proved in this case to admit circumstantial evidence tending to connect the accused with the crime.

6. CRIMINAL LAW—*Instructions Refused when Jury Already Fairly Instructed.* Where instructions given by the trial court clearly and fairly lay down the law applicable to the case, it is not error to refuse other instructions on the same subject tendered by the prisoner.

7. CRIMINAL LAW—*New Trials—After Discovered Evidence—Affidavits—Counter Affidavits.*—Applications for new trials are addressed to the sound discretion of the court, and are based on the ground that there has not been a fair trial on the merits. The same rules apply in criminal as in civil cases. Where the application is based on the ground of after discovered evidence, supported by affidavits, counter affidavits may be received to show that the alleged ground for a new trial does not exist. To justify a new trial for after discovered evidence, the evidence must have been discovered since the trial ; it must be material in its object, and such as, on another trial, ought to produce an opposite result on the merits ; it must not be merely cumulative, corroborative, or collateral ; and it must be evidence that could not have been discovered before the trial by the use of reasonable diligence.

8. CRIMINAL LAW—*New Trial—Verdict Contrary to Evidence—Appellate Court.* A new trial, on the ground that the verdict is contrary to the evidence, ought to be granted only in case of plain deviation from right and justice. And the appellate court will not set aside a verdict on such ground, except where the jury has plainly decided against the evidence, or without evidence. In the case at bar, the testimony, as a whole, produces a moral certainty that the accused is guilty beyond a reasonable doubt.

Error to a judgment of the Circuit Court of Henrico county, rendered December 21, 1893, sentencing the prisoner to be hanged.

*Affirmed.*

The opinion states the case.

*D. C. Richardson* and *H. M. Tyler*, for the plaintiff in error.

*Attorney-General R. Taylor Scott*, *Geo. D. Carter* and *C. R. Sands*, for the Commonwealth.

HARRISON, J.: Philip N. Nicholas was indicted in the County Court of Henrico, on the 24th day of December, 1892, charged with the murder of James Mills, and William Judson Wilkerson. He elected to be tried in the Circuit Court of Henrico county, and, after a protracted trial in that court, was, on the 11th day of October, 1893, found guilty of murder in the first degree, and on the 21st day of December, 1893, was sentenced to be hung. From this judgment of the Circuit Court he obtained a writ of error to this court.

The numerous exceptions taken to the ruling of the Circuit Court are so imperfectly arranged and numbered in the record, that it will be necessary to disregard this lack of order, in considering the various questions now to be disposed of.

*First.* There is an exception to the action of the Circuit Court in refusing to reject the record of the County Court, upon the ground that the said record was incomplete. It appears that while the case was pending in the County Court, and before the prisoner had elected to be tried in the Circuit Court, it was continued on motion of the Commonwealth, until the next term of the County Court, and fixed for trial on the 20th day of February, 1893. The record is silent as to what, if anything, was done at the February term, 1893. So far as appears the next action in the case was at the March term, 1893, when the prisoner was arraigned, and elected to be tried in the Circuit Court. It is insisted that the prisoner was entitled to a speedy trial, and that the record should show on whose motion the case was continued at the February term, 1893, whether the continuance was for good cause, or

upon the motion of the Commonwealth, so that the appellate court could ascertain whether the prisoner had been denied his right to a speedy trial. In the first place, this allegation is wholly immaterial, under the circumstances disclosed in this record. The statute guarantees to the accused a speedy trial by providing for his discharge if four terms of a County Court elapse without a trial, unless the record shows the case to have been continued for some one of the enumerated reasons therein set forth, but the fact that one term has passed without an order in the case is not a denial of the right of the accused to a speedy trial. Section 4047 of the Code, as amended by Acts 1893-4, p. 64.

This exception may be disposed of upon this further ground: There is no mention in the record that any County Court was held for Henrico county in February, 1893. Section 3045 of the Code provides that there shall be monthly terms of the County Court; but section 3049 and 3122 of the Code contemplate that a regular term of a court may not be held at all, and section 3123 provides that when the court fails to sit on any day appointed for it, or to which it may have adjourned, there shall be no discontinuance, and that all matters ready for the court to act upon, if it had been held, on any such day, shall be in the same condition, and have the same effect, as if continued to the next court in course. It not appearing that a court was held for the county of Henrico in February, 1893, it may be that for good and sufficient reasons, contemplated by law, no February term of said court was held, and under section 3123, quoted above, the prisoner's case stood continued until the next regular term, which was in March. The prisoner suffered no loss of right to a speedy trial by reason of the court not holding a February term. There was therefore no error in the refusal of the Circuit Court to reject the record on the ground that it was incomplete, in being silent as to the February term, 1893.

*Second.* Several bills of exception raise in different forms
the same question, as to the lawfulness of the County Court's
action at its June term, 1893. The prisoner having elected to be
tried in the Circuit Court, his case was called for hearing at the
May term, 1893, when he moved the court to remand his case
to the County Court, because the transcript of the record sent
to the Circuit Court, did not contain the writ of *venire facias*
which issued for the grand jurors who found the indictment,
nor the sheriff's return thereon, the prisoner desiring to in-
spect said papers and to move to quash the same. This mo-
tion the Circuit Court sustained, and ordered that the case be
remanded to the County Court, and that the prisoner be re-
manded to jail, and taken before the County Court. At the
June term, 1893, the prisoner was taken before the County
Court, and on motion of the Commonwealth's Attorney, an
order was entered directing the *venire facias* summoning the
grand jury, and the sheriff's return thereon, to be copied and
certified to the Circuit Court, and remanding the prisoner
back to that court. It is this action of the County Court
that is complained of in the exceptions under consideration.

When the case was called for trial on October 5, 1893, the
prisoner moved the court to quash this record of the County
Court, contending that after he had elected to be tried in the
Circuit Court the County Court could make no order in the
case; that, if it could, it might altogether change the record,
and deprive the prisoner of his rights. The court properly
overruled the motion. The Circuit Court, having acquired
jurisdiction to try the prisoner, had no power to remand the
case to the County Court for any purpose—not even on the
motion of the prisoner himself, as was the case here; and its
order remanding said prisoner was a nullity, and the prisoner
was never, after his election to be tried in the Circuit Court,
in point of law, out of that court. If the County Court had
failed to certify any part of the record, the duty of the Cir-

cuit Court was to have the record certified up as the law directed. *Howell* v. *Commonwealth*, 86 Va. 817.

*Third.* There is an exception to the action of the Circuit Court in overruling petitioners motion to quash the *venire facias* issued for summoning the grand jury by which the indictment against him was found, and the return thereon. No ground has been assigned in the petition, or at bar, in support of this motion, and, none appearing to the court, it was properly overruled.

*Fourth.* An exception is taken to the action of the court in refusing to quash the indictment against the prisoner, and overruling petitioner's demurrer to same.

This exception is without merit. No sufficient reason being suggested why the motion should prevail, and the court perceiving no error in the form of the indictment, the motion was properly overruled.

*Fifth.* Exception is taken to the action of the Circuit Court in refusing to quash the *venire facias* under which the jury was summoned for the trial of the prisoner, and the return thereon. It is insisted that the judge of the Circuit Court should have made up and furnished the list of jurors for the trial of the prisoner. It appears from the record that the *venire facias* was issued by the clerk of the Circuit Court of Henrico county, and directed to the sheriff of that county, commanding him to summon before the Circuit Court of Henico county, on the 2d day of October, 1893, (being the first day of the fall term of that court) twenty persons of said county, to be taken from a list to be furnished said sheriff, by the court of said county, who reside remote from the place where the felony is charged to have been committed, of which Philip N. Nicholas is accused, and who are qualified in other respects to serve as jurors, to recognize on their oaths whether the said Philip N. Nicholas be guilty of the felony aforesaid or not, and have then there the names of said persons and this

writ. The names of the twenty persons summoned are attached to the writ, and the following return of the sheriff endorsed thereon: "By virtue of the foregoing writ, I summoned the above named persons from a list furnished me by the judge of the County Court of Henrico county."

Comparing this writ with the law regulating the summoning of a jury for the trial of a case of felony, it is hard to conceive of the law being more literally complied with. Sections 4016 and 4018 of the Code of 1887 provide that the clerk of any court in which the trial of a case of felony is to be had, shall, as soon as may be, issue a *venire facias* directed to the officer, requiring him to summon twenty jurors for such trial from a list to be furnished him by the court of such county, or corporation, or the judge thereof, residing remote from the place, &c. Language could hardly be plainer, that the Circuit Court, as in the case before us, is to issue its *venire facias*, directed to the officer of said court, who is to summon twenty persons from a list to be furnished him by the county court, or the judge thereof. This is exactly what was done, and there is no error in the court's refusal to quash the writ and the return thereon.

*Sixth.* This exception is to the action of the court in admitting evidence showing the possession by the accused of an auger corresponding in size to the holes in the boat. The prisoner is charged with having murdered James Mills and William J. Wilkerson by drowning them in James river, while crossing in a boat, which is afterwards found to have three holes bored in it, which according to the prisoners own admission caused the water to fill the boat and thereby drown the deceased. The object of the evidence was to connect the accused with the crime by showing that he was the owner of an auger corresponding in size to the holes in the boat. It is always pertinent to show, as one element connecting an accused person with the crime charged, that he possessed the tools and in-

struments by which the crime had been committed, and the court properly admitted the testimony.

*Seventh.* This exception is to the action of the court in admitting the evidence showing that the prisoner had bought strychnine, and turned it over to the wife of James Mills, one of the drowned men, requesting her to administer it to her husband in milk or coffee, explaining that one grain would kill a man, and that about this time James Mills had three or four violent attacks of sickness suggesting poisoning by strychnine, and that at least two of these attacks were immediately after Mills had been given some dose or mixture by the prisoner. The testimony established the fact that criminal relations existed between the wife of James Mills and the prisoner, and the object of the evidence objected to was to show that the prisoner had on recent occasions, previous to the drowning, attempted to take the life of James Mills. While it is true that the State, for the purpose of showing that the defendant would be likely to commit the crime charged, cannot prove that he committed other like crimes against another person, it is nevertheless competent to show that the accused made previous attempts on the life of the same person. It shows animus and intent. It rebuts the theory of accident. Previous threats are undoubtedly admissible. Then, certainly, previous attempts upon the life of deceased by the accused are more pertinent to show his animus and intent. "In cases of homicide it has always been competent to show the conduct and the feelings of the prisoner toward his victim, and proof that he had made previous threats, or attempts to kill his victim has always been received." *People* v. *Jones*, 99 N. Y. 667, citing 3 Russell on Crimes (9th ed.) 288; Roscoe's Crim. Ev. (7th ed.) 18; Wharton on Hom. (2d ed.) § 693; 2 Colby's Criminal Law, 193. Evidence of such facts is received, not because such facts give rise to a presumption of law of guilt, but because from them, in connection with

other circumstances, guilt may be inferred. 1 Green Ev. sec. 53, note b. "On the trial of an indictment for murder, former grudges and antecedent menaces are admitted to be given in evidence as proof of the prisoner's malice against the deceased." 3 Russ. Cr. (9th ed.) 288. In the case of Carlyle W. Harris, decided by the Supreme Court of New York in 1893, the court, in sustaining the admission of evidence of prior acts, said: "If the depraved acts, offered to be shown, evidence or throw light upon motive, they become admissible." 136 N. Y. 449. The previous threats and attempts to take the life of James Mills were evidence tending to show that the accused had long deliberated upon the subject; that he had conceived the purpose of taking the life of deceased before the day it was taken; and they were competent evidence, both upon the question of deliberation and premeditation.

*Eighth.* This exception is to the action of the trial court in admitting evidence going to show that shortly before the drowning, and about the time of the attempts at poisoning, the prisoner stated to three or four different persons in the neighborhood, and among the friends and relatives of Mills, that "Mills had heart disease and was liable to die at any time." Such evidence as this is always admissible, under the circumstances attending its introduction into this case. Wharton, in his work on Criminal Evidence, says, in connection with such evidence as this "may be noticed false representations as to the state of another person's health, with the intention of preparing the relatives for the event of sudden death, and to diminish the surprise and alarm which attend its occurrence. * * * It may also be noticed that persons contemplating secret assassination are apt, as part of their scheme, to throw out dark hints, spread rumors, and utter prophecies relative to the impending fate of their intended victim." Wharton Cr. Ev. (9th ed.) sec. 754.

It is contended by counsel for prisoner that all the evidence considered under the last three exceptions, if admissible at any time, was not admissible until the *corpus delicti* had been clearly proven; that the Commonwealth, to establish the *corpus delicti*, should prove, not only that the parties alleged to have been murdered were dead, but that such death was caused by the criminal agency of another. If the contention of counsel was sound, there could be no conviction upon circumstantial evidence. Where the criminal agency of the accused is to be established by circumstantial evidence, it can only be done by proving the circumstances. In every criminal prosecution. there are two fundamental and essential facts to be established: first, that the party alleged to have been murdered is dead; and, second, that the death was brought about by the criminal agency of another. The *corpus delicti* is a material fact to be established in every criminal prosecution. In *Smith's case*, 21 Gratt. 809, this court says: "The material fact in every criminal prosecution is the *corpus delicti*. *Proof of the charge* in criminal cases, involves the proof of two distinct propositions: first, that the act itself was done; and, secondly, that it was done by the person charged. In murder *the corpus delicti* has two components—death as the result, and the criminal agency of another as the means. It is only when the first (that is death by criminal violence) has been proved either by direct evidence of witnesses *who have seen and identified the body*, or when proof of the death is so strong and intense as to produce the full assurance of moral certainty, that the other (the criminal agency) can be established by circumstantial evidence. See also *Dean's case*, 32 Gratt. 912.

In 3 Greenleaf, sec. 30, the author says: "The death and the identity of the body being established, it is necessary, in the next place, to prove that the deceased *came to his death by the unlawful act of another person.*"

Applying these principles to the case under consideration,

we perceive no error in the introduction of the evidence objected to by the prisoner. The death and identity of the persons alleged to have been murdered was fully proven; that they came to their death by drowning was shown by abundant expert testimony; and, in the language of the learned author just quoted, it was necessary, in the next place, to prove that the deceased came to their death, by the unlawful act of another person. And this the Commonwealth was proceeding to do, by the introduction of the evidence objected to.

*Ninth.* Exception is taken to the evidence of Mrs. Mills, as to a "*fuss*" between her husband, James Mills, and the prisoner, on the ground that such evidence was hearsay, and therefore inadmissible. This was a trifling matter about a half day's work, and could not have been a material consideration in the case, and the evidence of Mrs. Mills on this point shows that she did hear whatever "*fuss*" there was. The only hearsay part of the remark was the witness' saying, "Mr. Mills told me, when he came out of the room, that they had compromised the matter." It was important for the prisoner to show that the trouble had been settled between them, and therefore the remark of Mrs. Mills that her husband said it had been compromised could not, in any possible sense, be prejudicial to the accused.

*Tenth.* Exception is taken to the action of the court in refusing to give the instructions asked for by the prisoner, and in giving others in lieu thereof. It is unnecessary to comment upon the merits or demerits of the eleven instructions asked for by the prisoner, for the reason that the instructions given by the court clearly and fairly lay down the law applicable to the case; they completely cover every point proper to be guarded, and liberally expound the law as to every phase of the prisoner's rights.

*Eleventh.* Exception is taken to the action of the court in

overruling the prisoner's motion in arrest of judgment upon affidavits introduced to show a failure of territorial jurisdiction, it being contended that the point in the river where the drowning occurred was in Goochland, and not in Henrico county. The evidence is conclusive that the drowning occurred in Henrico county, and this motion was properly overruled.

*Twelfth.* Exception is taken to the action of the court in overruling the prisoner's motion in arrest of judgment on the ground of after discovered evidence, which motion was supported by affidavits, and for receiving and considering counter affidavits filed by the Commonwealth, at the time appellant filed his affidavits.

Motions for new trials are governed by the same rules in criminal as in civil cases. *Grayson* v. *Commonwealth*, 6 Gratt. 712. The application for a new trial is addressed to the sound discretion of the court, and based upon the ground that there has not been a fair trial upon the merits. I can see no good reason why counter affidavits cannot be filed for the purpose of showing that the alleged ground for a new trial has no existence. Counter affidavits may properly be received in opposition to a motion for a new trial on the ground of newly discovered evidence. *Finch* v. *Grim*, 16 Minn. 355. The evidence of J. T. Lewis shows that on the 10th of September, 1892, he sold the prisoner strychnine; that the prisoner objected to giving his name and having it entered on the books as required by law, but that he required him to do so; that witness made the memorandum in the book in his own handwriting, as follows: "Price, 20 cents; name of poison, Strychnine; quantity, one drachm; for what purpose, to kill rats and dogs; age, 45; color, white; name of purchaser, P. N. Nicholas; residence, Sabot Island, Goochland Co.; by whom dispensed, J. T. Lewis." Now, the after discovered evidence, upon which the court is asked to give a new trial, is the affidavit of Walter F. Phillips, a

former clerk in this drug store, who at the time of the affi-
davit lived in Radford, Virginia, to the effect that Lewis did
not sell the poison, as the memoranda shows, but that he
(Phillips) sold it, and that Nicholas afterwards returned it.
Messrs. D. C. Richardson and H. M. Smith, counsel for
prisoner, file a joint affidavit, that after they learned of this
evidence they made diligent effort to find W. F. Phillips, but
were unable to do so before the trial.    The prisoner files the
affidavit of the jailor, which shows that the prisoner told him,
a month or two after he was put in jail, that they were after
him about that poison, and said he had taken it back.    This
affidavit also says the prisoner told him at that time he had
bought the poison from J. T. Lewis, which is one of the
points in dispute between Lewis and Phillips.    From this
affidavit it would appear that the prisoner knew for eight
months before the trial that the Commonwealth would intro-
duce the evidence about his purchase of this poison.    Lewis
files a counter affidavit in which he says, "there can be no
mistake about my having sold the poison to P. N. Nicholas,
or about the fact that it was never returned to my store after
it was taken away by him."    The circumstances controlling
the granting of new trials upon the ground of after discovered
evidence have been so often laid down by this court that it
would seem to be useless to repeat them here.    They are fa-
miliar to the profession, and may be summed up thus:

1st.    The evidence must have been discovered since the trial;

2d.    It must be evidence that could not have been discovered
before the trial by the exercise of reasonable diligence;

3d.    It must be material in its object, and such as ought,
on another trial, to produce an opposite result on the merits;

4th.    It must not be merely cumulative, corroborative, or
collateral.    4 Minor's Inst. Part 1, 758, 759; *St. John's
ex'ors* v. *Alderson*, 32 Gratt. 140, 143; *Wynne* v. *Newman's*

*Adm'r et al.*, 75 Va. 817; *Whitehurst* v. *Commonwealth*, 79 Va. 556, &c., &c.

Applying these well settled axioms to this case, it appears that the evidence was known to both the prisoner and 'his counsel before the trial. Without for a moment doubting that learned counsel used what they considered reasonable diligence to find W. F. Phillips, who lived in Radford, still it was not such diligence as the law requires. And, further, they could have moved the court for a continuance of this case, in order that they might have additional time in which to try to find the witness, but they did not do this. The newly discovered evidence must be material in its object, and such as ought on another trial, to produce an opposite result, on the merits. Would the new evidence, as disclosed by these affidavits, avail to produce an opposite result, on the merits? I think not. The most that it does is to raise a question of veracity between the druggist, Lewis, and his clerk, Phillips, as to whether the poison was returned, as alleged, with the great preponderance of evidence in favor of the accuracy of the testimony of Lewis. But, suppose the jury should believe that the poison was returned, Would that necessarily, or even probably affect the result? Does not the important and material point established by this evidence, in either event, remain, namely, that the prisoner had this poison, or some other, at the house of the deceased, Mills, and that he produced it, and explained to Mrs. Ann A. Mills, wife of deceased, that a grain of it in milk or coffee would kill any man, and ask her to give it to her husband? This shows his purpose or desire to destroy the deceased, and it is a matter of very little consequence whether the poison was returned afterwards or not. The evidence offered as newly discovered is not admissible upon any of the grounds regulating the granting of new trials, and there was no error in the Circuit

Court's refusal to grant a new trial upon the ground of after discovered evidence.

*Thirteenth.* Exception is taken to the action of the Circuit Court in refusing to set aside the verdict of the jury, as contrary to the law and the evidence.

A new trial asked on the ground that the verdict is contrary to the evidence ought to be granted only in a case of plain deviation from right and justice. And this court will set aside a verdict, on such a motion, only in a case where the jury have plainly decided against the evidence, or without evidence. *Blosser* v. *Harshberger*, 21 Gratt. 214, and cases cited; see also, section 3484 of Code, as amended. (Acts 1891-2, p. 962). Guided by this rule, I will briefly review the evidence upon which the verdict is founded.

On the 8th day of December, 1892, Philip Norman Nicholas, the plaintiff in error, one James Mills, and his wife, Ann A. Mills, and their three small children, were living in the upper part of Henrico county, on a farm known as the "Wickham place," about one mile from James river. Nicholas was the renter of this farm, and cultivated it on shares. He was himself, however, chiefly engaged as a trapper, having a number of traps set along both sides of the river. He employed James Mills, with whom he lived, and one William Judson Wilkerson, as sub-tenants, to do the farm work for a portion of his share of the crops. Wilkerson lived with an aged mother in a small house very near to Mill's house, near enough to see into the windows of one house from the other. Philip N. Nicholas, the prisoner, was an unmarried man, and lived in a room of the house occupied by James Mills and his family. The evidence shows that on the night before the drowning, the prisoner, James Mills and William J. Wilkerson, were together at the house of Mrs. Wilkerson, the mother of William J. Wilkerson, and there arranged and determined upon a trip acros the river the next morning to take a bee tree. This

expedition was suggested, planned, and carried out by the prisoner. Wilkerson was very unwilling to go, and finally consented at the suggestion of his mother, who said that, as Mr. Nicholas seemed so anxious for him to go, he had better do so. Mills was unwilling to go unless Wilkerson went. Wilkerson said he would rather plough than go. The prisoner replied, if you will go, you shall not lose anything. In the course of conversation which resulted in this expedition being agreed upon, both Mills and Wilkerson stated, in the presence of Nicholas, that they could not swim, and were very much afraid of water; that they did not like water more than knee deep. The fact that they could not swim was generally known to their friends. It is further shown that it was the habit of Nicholas to go every morning early to the river to examine his traps. And it appears from the evidence that on the morning of the day the drowning occurred he went to the river about daylight, and returned about breakfast time, and, when questioned about it, said: "I did not go to my traps this morning. I was sick." He afterwards told Mrs. Wilkerson he did not catch anything. Everything being in readiness to carry out the plan for the day, these three men started from home about nine o'clock in the morning, equipped with everything necessary for taking the bee tree; having with them two buckets holding two and one-half to three gallons each for the honey, two axes, one hatchet, and a piece of netting to protect the person from the bees. The boat used belonged to one Jos. Bruin, and on their way to the river an uncle of the owner was asked if they might use the boat, and was told they could get the key which unlocked the boat from its fastening to the bank, from Bruin, the owner. The prisoner replied that he had a key of his own, and had often used it before without permission. It appears that they landed on the Chesterfield side of the river, at a point one mile and a half from where any one lived, and pro-

ceeded to the bee tree, which was one mile from the point of landing. Investigation showed there were no tracks about the point of landing but those of the three men going from and returning to the boat. It further appears from the statement of the prisoner that after reaching the tree they concluded not to cut it, because it was a large tree near the main road, and might get them into trouble, and for the further reason that the hole was small, and it might not have any honey in it, anyhow. [The tree was afterwards cut by order of the magistrate, and found to be full of honey.] It further appears that the boat was a small one, about ten feet long, and about two and a half feet wide, and that both in going over and returning the prisoner sat in the extreme rear of the boat, with his face to the front, and that Wilkerson and Mills sat in front of him, with their faces to the front and their backs to the accused. This position of the parties the prisoner admitted very reluctantly, when questioned about it. When returning, and about fifty yards from the Henrico shore, the boat suddenly filled with water, and Mills and Wilkerson were drowned, and the prisoner swam to shore. The next day the magistrate of the district was notified of the occurrence, and an investigation was set on foot. The boat was gotten out of the water, and it was found that immediately under the seat where Nicholas sat there were three holes freshly bored with an inch and a half auger. The evidence of the owner of the boat shows that on Tuesday evening, the 6th of December, he used his boat and it was sound. It was taken by Nicholas for this fatal trip Thursday morning, the 8th of December. Further investigation discovered the fresh pine shavings corresponding to size of the holes and to the wood the boat was made of, which had been thrown into the water, but had drifted upon the shore near the point where the boat had stood fastened to the Henrico side. There were also found corn cobs which had been cut to exactly fit the

holes in the boat, which had also drifted to the same point.
It was shown that the prisoner had in his possession an auger
just the size of the holes.   This the prisoner at first denied,
but afterwards said it must be about the place somewhere.
Diligent search was made for this auger, but it was never
found.   When the magistrate went, the next day after the
drowning, to get the prisoner to assist in making these inves-
tigations, and to show exactly where the men were drowned,
he declined to go, saying that his head, eyes, and ears were
full of water, and that he was feeling badly.   The magistrate
returned a second time.   The prisoner again declined to go mak-
ing the same statement as before about his eyes, ears, and nose
being full of water; but, when told that he would be arrested
if he did not go, he yielded.   The prisoner stated, when re-
turning from the Chesterfield side, that the holes burst into
the boat, and it commenced filling with water rapidly; that
he urged the men to remain in the boat and bail out the water
with the buckets, and he would take them safely to shore;
that notwithstanding this they jumped out, and the last he
saw of them they were swimming very strong.   He also told
Mrs. Wilkerson that the last he saw of her son he was swim-
ming finely.   At another time he said he did not know
whether they were swimming or not.   He told Officer Hall,
who arrested him nearly three days afterwards, that when he
found the water was coming into the boat he holloed to the
men to jump out, that the boat was sinking.   It appears
from the prisoner's statement that when he swam to the shore
he climbed out with great difficulty, and lay upon the bank,
in an exhausted condition, for some time.   It further appears
that he went home, to Mills' house, by a circuitous route,
avoiding acquaintances and neighbors to whom he might have
at once communicated the shocking occurrence to which he
had just been an eye witness.   When he was 200 yards from
the house, and before he was near enough for any one to tell

his condition or to see that he was wet, he was seen by Mrs. Mills, the wife of the drowned Jas. Mills, who commenced, in a most excited way, screaming and wringing her hands, saying: "Jimmy (meaning her husband) is drowned, is drowned! yonder comes Mr. Nicholas." The prisoner went immediately into Mrs. Mills' house, and, according to the testimony, was wringing wet, and stood for fifteen minutes without saying a word, and, when he spoke, said to Mrs. Mills, "they are drowned." Mrs. Wilkerson, alarmed as to the fate of her son, sent messages seven times to the prisoner, begging him to come to her room, that she might ask about. Judson. Mrs. Wilkerson was an aged cripple, and could not get about. The prisoner, after the lapse of two hours and a half, went to Mrs. Wilkerson. She said, "pray tell me where my boy is." He replied, "I will as soon as I can speak." And, after a great deal of waiting, hesitating, excess of emotion, and unnatural weeping, he said: "I am afraid your dear boy is gone. The last I saw of him, he was swimming finely about thirty yards from the bank." She asked him to telegraph her friends in Richmond. He said it was not worth while. "He will not be seen for seven or eight days, and to-morrow, if you *are anxious*, I will write." The dead bodies of Mills and Wilkerson were taken from the river December 15th. On the night of December 10, 1892, about one o'clock, the prisoner was arrested by Officers Hall and Tomlinson, of Richmond, accompanied by Mr. Rugg, the magistrate. They found the prisoner in Mrs. Mills' room. He showed no surprise, seemed to be expecting to be arrested, asked no questions, and immediately commenced putting on his clothes. He asked Mrs. Mills for his money. She felt under her bed clothes, got the pocket book out, and handed it to him. Officer Hall says that, whenever he would ask the prisoner a question, he would reply that he had lost his recollection since he got into the water; that he had been crazy nearly ever

since, and his memory was all gone, from getting water into his mouth and ears.

The evidence fully establishes the fact that the prisoner had been guilty of criminal relations with Mrs. Mills for twelve months prior to the drowning, and most probably for a much longer time; that he had on several occasions proposed to Mrs. Mills to leave her husband and live with him; that he told Mrs Willkerson that Jim Mills was hard to get along with, and he thought he would get rid of him. He also told this witness he had a difficulty with Mills about his wife, and said Mills was *superstitious*. It is further proved that, on the night immediately following the day of the drowning, prisoner again told Mrs. Mills she must now live with him, and he would do all he could for her, and the next morning after the drowning, he was seen in Mrs. Mills room, in her bed.

It appears from the evidence that several months before the drowning he bought strychnine from J. T. Lewis, a druggist in Richmond, took it to the house of Mills, put it in Mrs. Mills' desk, called her attention to it, explained that one grain in milk or coffee would kill a man, and told her to administer it to her husband. It further appears that, on several occasions about the time this poison was shown to be in the house, Mills became suddenly and violently sick, appearing to be paralyzed in the mouth; great redness over the face; complained of hurting all across his heart and limbs, foaming at the mouth, jerking, &c. These spells are described as occurring early in the morning, when the prisoner and Mills had just taken a drink together. When it was proposed to send for a doctor, on one of these occasions, the prisoner objected, saying doctors were not what they were cracked up to be. It appears that, on repeated occasions during the time James Mills was having these attacks, the prisoner stated at different times, to friends and relatives of deceased, that said James Mills had heart disease, and might die at any time.

The prisoner stated while in jail, "if this woman will hold her tongue, it will help me." There are many other important, inculpatory circumstances proved, which are very significant and weighty. An attempt, however, to review them all, would extend this opinion to an unreasonable and unnecessary length. I have attempted to point out some of the salient and more important facts, as they appear in the record of this remarkable case, and, without commenting upon them, it is sufficient to say that so far from the verdict of the jury being against evidence, or without evidence to sustain it, the testimony, considered as a whole, produces upon the mind a moral certainty that the accused is guilty, beyond all reasonable doubt, of the horrible double murder with which he is charged.

With an anxious regard for human life, and an earnest desire to look on every circumstance with the most favorable eye to the prisoner, I am constrained to the conclusion that upon the whole case there is no error in the judgment of the Circuit Court, and the same must be affirmed.

The other judges concur in the opinion of HARRISON, J.

AFFIRMED.