# Wytheville.

## A. T. REYNOLDS v. COMMONWEALTH.

### June 15, 1922.

1. JURY—*Quashing Venire Facias—Summoning Jurors who are Members of the Panel that was Quashed—Case at Bar.*—In the instant case, a trial for murder, the original writ of *venire facias* for the term, and all additional writs were quashed "on the ground of various irregularities." No reason appeared why the court might not regularly and safely have proceeded to select a jury from the persons already summoned, but the writs were quashed. The court then directed a new *venire facias* and furnished a list of jurors to be summoned thereunder. This list contained the names of persons who were embraced in the previous *venire facias* which had been quashed. It appeared affirmatively that the jurors summoned under the new list were free from all legal exception.

    *Held:* That the action of the court was expressly authorized by section 4896 of the Code of 1919.

2. JURY—*Quashing Venire Facias—Summoning Jurors who are Members of the Panel that was Quashed.*—Persons free from any sort of incompetency as jurors cannot be rendered incompetent merely by quashing, for some alleged but undisclosed irregularity, the writ of *venire facias* under which they had been previously summoned. Competent and suitable jurors are not rendered incompetent and unsuitable by the mere fact that they had been named in a previous *venire facias* which had been quashed. The case would be otherwise where there was no formal irregularity in the writ which was quashed, but an inherent incompetency of the jurors as such. In such case, the mere substitution of a new writ with the same list could not remove their incompetency.

3. INSTRUCTIONS—*Repetition—Refusing Instructions on a Point Upon Which the Jury Have Been Already Properly Instructed.*—In the instant case, a prosecution for homicide, it could not be doubted that, if the jury had accepted the theory of self-defense and had credited the testimony of the defendant in support thereof, they would have extended to him exactly the same consideration and leniency by reason of an instruction given by the court which they would have given him if, instead thereof, or along therewith, the court had likewise given two instructions asked for by the accused. It was manifest, therefore, that there was no error in refusing to give the two instructions asked.

4. Homicide—*Instructions—Refusing Instructions on a Point Upon Which the Jury Have Been Already Properly Instructed—Case at Bar.*— In a prosecution for homicide, the accused asked the court to instruct the jury that he had the right to determine from appearances and the actual state of things surrounding him as to the necessity of acting in self-defense; and, if he acted from reasonable and honest conviction as to his danger, he was not responsible, even though mistaken; and that in determining his danger he had the right to take into consideration the relative size and strength of the party assaulting him.

   *Held:* That the refusal so to instruct the jury was not error where the court gave an instruction that, if deceased acted so as to cause the defendant to reasonably believe that he, deceased, intended to kill him, or to inflict upon him great bodily harm, and that such danger was imminent, they should find for the defendant.

5. Homicide—*Instructions—Provocation—Manslaughter.*—Where there was no evidence of a difference between deceased and defendant before the killing, but it was not denied that there was an altercation at the time of the killing between the accused and the deceased, and there was a marked conflict in the evidence as to the character of such altercation, and according to the testimony of the Commonwealth, the accused shot the deceased upon very slight provocation, it would have been error for the court to tell the jury that any altercation; even though it included sharp words by the deceased, would rebut the presumption of malice arising from the killing, and would give rise to the contrary presumption that such killing was upon heat of passion and hot blood, and therefore manslaughter only.

6. Homicide—*Manslaughter—Provocation—Words.*—Sharp words alone do not constitute adequate provocation to reduce a killing with a deadly weapon from murder to manslaughter.

7. Homicide—*Provocation—Manslaughter—Instructions.*—In the instant case the instructions defining voluntary and involuntary man-. slaughter and the provocation necessary to reduce murder to manslaughter held quite as favorable to accused as he was entitled to ask for.

8. Homicide—*Instructions—Malice Towards One as Evidence of Malice Towards Another.*—In a prosecution for homicide, the accused asked for an instruction that proof of ill will of accused against a brother of deceased some time prior to the killing could not be taken as any evidence of malice or ill will towards deceased, unless there was shown to be some connection between the trouble between accused and the brother of deceased and that between accused and deceased.

   *Held:* That while there might have been no good reason why this instruction should not have been given, its refusal did not prejudice accused where the Commonwealth's evidence established a direct and immediate connection between the trouble between accused and a brother and the trouble between accused and the deceased, so that the instruction would have been tantamount to telling the jury

that evidence of defendant's ill will towards the brother of deceased ought to have been taken into consideration as evidence of his malice in killing deceased.

9. HOMICIDE—*Malice—Evidence.*—The circumstances directly leading up to the assault or homicide are admissible as evidence to prove or rebut malice, though such evidence may tend to prove the commission of a distinct offense. So also evidence of an assault immediately after an assault or homicide upon another member of the family or party of the person assaulted, or upon one offering him assistance, is admissible to prove the maliciousness of the original act.

10. HOMICIDE—*Argument of Counsel—Accused Arming Himself to Kill One Person and Killing Another.*—In a prosecution for homicide, the attorney for the Commonwealth used the following language: "In the eyes of the law, if I arm myself with a pistol to kill one special individual, and I go and kill another and different person, I am just as guilty as if I had killed the person I first got the pistol to kill; and when the defendant here, Anthony Reynolds, went to that house and got his pistol for Edgar Reynolds to kill him with, and afterwards killed Alvis Reynolds, under the circumstances claimed to be established by the evidence, with it, he is guilty of malice towards the deceased, Alvis Reynolds."

*Held:* That, while the first part of the argument was not an accurate statement of law, as a whole the argument was substantially correct in principle and was supported by the law and the evidence.

Error to a judgment of the Circuit Court of Patrick county.

*Affirmed.*

The opinion states the case.

*W. L. Joyce, Hooker & Hooker,* and *S. A. Thompson,* for the plaintiff in error.

*John R. Saunders, Attorney-General, J. D. Hank, Jr., Assistant Attorney-General,* and *Leon M. Bazile, Second Assistant Attorney-General,* for the Commonwealth.

KELLY, P., delivered the opinion of the court.

A. T. Reynolds, upon an indictment for the murder of his son, Alvis J. Reynolds, was found guilty of that

crime, in the second degree, and sentenced to the penitentiary for a term of eight years.

The evidence in the case upon some of the material points is conflicting, but, from the standpoint of the Commonwealth and as supporting the verdict, justifies the following statement:

The killing occurred on Sunday afternoon, December 19, 1920. The deceased, Alvis Reynolds, a man of about thirty years of age, lived at Danville, and had come to his father's home on a visit. On the day of the tragedy a number of persons were at the Reynolds home, most of whom, including the accused and the deceased, were drinking. After dinner four of the party, the accused, the deceased, Arthur Reynolds, another son, and Joe Penn, a nephew of the accused, left the house and engaged in a game of cards in the open air near the corn crib. Others of the party, including Edgar Reynolds, the eldest son of the accused, were present watching the game. Some dispute arose among the players, and the accused said he was going to quit. At that juncture Edgar Reynolds mildly remonstrated with his father, telling him not to quit and that the game was going all right. This offended the accused, although it ought not to have done so, and resulted in some angry words between the two for which he was chiefly if not wholly to blame. Finally, in response to a remark which he had provoked from Edgar, he said: "You won't come up to the house and tell me that." After throwing out this challenge, he immediately went to the house, placed a pistol in the right hand pocket of his trousers, and came back. In the meantime Edgar had taken his father's place in the game. On his return, the accused stood or walked around the party for a short time, keeping his right hand in his pocket and looking at the crowd angrily.

He said nothing, however, and in a short time went to the stable near by to water his mules.   After taking one mule to the creek and returning to the stable, he led two others out to take them to water.   Having some difficulty in leading them, he picked up a wagon standard with which he severly beat one of them over the head.   The other mule got away, and the accused then rode the one he had been beating down to the creek.   About that time the deceased, Alvis Reynolds, who with the other players had seen the accused beating the mule, said: "Boys, I am going down to the creek and tell pap not to whip them mules any more.  They haven't done anything to be whipped for," or words to that effect.   Suiting the action to the word, the deceased went down to the creek where the accused was sitting on the mule.   The deceased raised his hand as if talking to the accused, and said: "Pap, you have got to quit beating these mules.   They haven't done anything to be beat for and I won't stand for your beating them."   Thereupon the accused immediately drew his pistol and fired the fatal shot.   He then rode back towards the stable, pistol in hand, and was met by Edgar Reynolds, who said: "I am going to arrest you, pap.   You have shot my brother."  The accused replied: "Yes, and by G— I have just killed one d— n s— of a b—, and will put another in the same fix."   A struggle ensued in which Edgar, with the aid of two other men and the wife of the accused, succeeded in overcoming him and getting the pistol out of his hands.   In the struggle he fell or was pulled from the mule, and was held down on the ground by Edgar, whom he tried to shoot several times before he was subdued and compelled to give up the pistol.

The accused testified that the deceased, when he

came to the creek, picked up a rock, and that an altercation occurred between them in which he, the accused, endeavored to avoid the difficulty, and shot in self-defense after the deceased had not only threat-- ened to beat him to death but had taken the mule by the bridle with one hand, and had struck him in the side with the rock which he still held in the other hand.

We need not go into more detail as to the evidence.. It is sufficient to say that it abundantly supported the verdict, and that, therefore, we cannot interfere with the judgment unless we shall find some error in the rulings of the court in respect to matters other than the sufficiency of the evidence.

The first assignment of error relates to the validity of the *venire facias.*

After two postponements during the term, the case finally came to trial on May 23, 1921.  Both the Commonwealth and the defendant having answered ready, the defendant "craved *oyer* of the original list of veniremen drawn for this term of the court, and the original writ of *venire facias* for this term, and all additional writs of *venire facias* summoning venire-- men to appear at this term, and when the same were presented moved to quash the same."

The order of the court merely shows that this motion to quash was based "on the ground of various irregu- larities in connection therewith."  We have not been shown and have not found any reason why the court might not regularly and safely have proceeded to select the jury from persons already summoned under the original writ supplemented by the alias which had been issued in the instant case; but the motion was sustained and all the writs were quashed.  This left the court without a panel of jurymen, and proceeding upon its own motion it ordered a new *venire facias*:

directing the sheriff to summon from a list of twenty-four names furnished by the judge twenty persons as jurors for the trial of the case.    There had been, under the original and various alias writs of *venire facias* which were quashed, a total of fifty-nine jurymen summoned at that term.    The names on the list furnished by the judge for the new writ were taken from this number.

The defendant then moved the court to quash the new *venire facias* on the ground that the persons named in the list furnished by the judge and contained in the writ "were embraced in the previous *venire facias* and were in attendance upon the court."    This motion was overruled, and the defendant excepted.

[1, 2] There was no error to the prejudice of the accused in the action of the court here complained of. Section 4896 of the Code expressly authorized the trial court, upon quashing the writs, to direct a new one and to furnish a list of jurors to be summoned there-under.    The writ and list were regular, and no reason has been shown why the jurors thus summoned were not duly qualified to serve.    Indeed, the record affirmatively shows that they were "free from all legal exception."    As already pointed out, so far as appears, the court might very well have denied the first motion to quash, because it was perfectly proper to supplement by an alias writ the panel which had been summoned and was in attendance under the original writ.    This had been done, and it thus appears that the court did an unnecessary thing in quashing the original and alias writs, but an equally harmless thing in directing a new one.    If the number and qualifications of the jurors available under the original and alias writs were in accordance with the law, surely it cannot be reasonably said that identically the same

persons were rendered incompetent as jurors by the unnecessary but harmless process of summoning them a second time. The controlling object of the law is to secure a fair and impartial jury; and there is nothing in the record to indicate that this end was not attained in the instant case.

This conclusion is not, as contended by counsel for the defendant, in serious conflict with the decision in *Looney* v. *Commonwealth*, 115 Va. 921, 78 S. E. 625. It was there held to have been error for the trial judge to designedly include in a new *venire facias* the same names embraced in a former writ which had been quashed, but the opinion must be read in the light of its own facts, and in that case the original *venire facias* had been quashed because the list had been drawn in the presence of a commissioner in chancery who was one of the prosecuting attorneys. While there was no charge of improper motive or intentional misconduct on the part of the commissioner, it was practically a concessum in the case that the persons thus drawn were improper jurors, and ought not to be allowed to serve. There was no formal irregularity in the writ, but an inherent incompetency of the jurors as such, and this being true, of course the mere substitution of a new writ with the same list would not remove the incompetency. In the instant case we have the converse proposition, namely, a list of persons free from any sort of incompetency as jurors, and they certainly cannot be rendered incompetent merely by quashing, for some alleged but undisclosed irregularity, the writ of *venire facias* under which they have been previously summoned. Furthermore, it is to be noted that the new *venire facias* condemned in the case cited was in itself vitally at variance with certain mandatory provisions of the statute under which it was issued, while the writ in this case is strictly regular in every detail.

The *Looney Case* does not refer to, and is not to be construed as overruling the principle announced by this court in *Mitchell* v. *Commonwealth*, 33 Gratt. (74 Va.) 845, 851, and *Waller & Boggs* v. *Commonwealth*, 84 Va. 492, 495, 5 S. E. 364, in both of which it was held that competent and suitable jurors were not rendered incompetent and unsuitable by the mere fact that they had been named in a previous *venire facias* which had been quashed.

[3, 4] The second assignment of error involves the action of the court in giving and refusing instructions.

The defendant asked for and the court refused to give instructions "J" and "K" which were, respectively, as follows:

"J. The court instructs the jury that the defendant, A. T. Reynolds, at the time of the shooting of Alvis Reynolds , had the right to determine from appearances, and the actual state of things surrounding him as to the necessity of acting in self-defense; and if he acted from reasonable and honest conviction as to his danger, he will not be held responsible criminally, even if he was mistaken as to the danger he was in."

"K. The court instructs the jury that where the killing takes place in a combat, the prisoner has the right in determining his danger of great bodily harm, to take into consideration the relative size and strength of the party assaulting him."

We are of opinion that there was no error in refusing the two instructions above quoted, for the reason that in so far as they correctly stated the principle of the law intended to be invoked thereby, they were sufficiently substituted by instruction "I" given for defendant as follows:

"The court instructs the jury that if they believe from the evidence that Alvis Reynolds, at the time

of the fatal difficulty, did any act, or acts, of such a character as to cause the defendant, A. T. Reynolds, to reasonably believe that he, the said Alvis Reynolds, intended to kill him, or to inflict upon him some great bodily harm, and that such danger was imminent, then you should find the defendant not guilty."

It cannot be doubted that if the jury had accepted the theory of self-defence and had credited the testimony of the defendant in support thereof, they would have extended to him exactly the same consideration and leniency by reason of instruction "I" which they would have given him if, instead thereof, or along therewith, the court had likewise given instructions "J" and "K". It is manifest, therefore, that there was no error in refusing to give the two instructions last mentioned. *Nicholas* v. *Commonwealth*, 91 Va. 741, 751, 21 S. E. 364.

Instruction "L," asked for by the defendant and refused, was as follows:   "The court instructs the jury that if they believe from the evidence that no angry words had passed between A. T. Reynolds and the deceased, and that no visible signs of anger had manifested themselves on the part of A. T. Reynolds against the deceased, at any time prior to their meeting together at the creek where the killing was done, and that sharp words were spoken by A. J. Reynolds to the defendant at the creek, and that an altercation ensued in which the deceased was killed, these facts are sufficient to warrant the jury in finding that the killing was not done with malice aforethought; but the presumption is that such killing was upon heat of passion and hot blood, and therefore manslaughter only."

[5, 7] The court was clearly right in refusing this instruction.   It is not denied that there was an alter-

cation at the creek between the accused and the defendant, but there was a marked conflict in the evidence as to the character of such altercation. According to the testimony of the Commonwealth, the accused shot the deceased upon what might well have been considered very slight provocation, and it would have been error for the court to tell the jury, as in effect requested by this instruction, that any altercation, even though it included "sharp words" by the deceased, would rebut the presumption of malice arising from the killing, and would give rise to the contrary "presumption that such killing was upon heat of passion and hot blood and therefore manslaughter only." Sharp words alone do not constitute adequate provocation to reduce a killing with a deadly weapon from murder to manslaughter. See *McCoy* v. *Commonwealth, ante p.* 731, 112 S. E. 704, decided today. The law in this respect was propounded in defendant's instructions "F" and "O" quite as favorably as he was entitled to ask for it. These instructions were as follows:

"F. Voluntary manslaughter is the unlawful killing of a human being in heat of blood and sudden passion, upon adequate provocation, and not for malice. And involuntary manslaughter is the unintentional killing of a human being in connection with the doing of an unlawful act."

"O. The court instructs the jury that although they may not believe from the evidence in this case that A. T. Reynolds, the defendant, shot and killed Alvis Reynolds in self-defense, yet if it appears from the evidence that the killing was not because of any previous grudge, or malice, but was done in the course of a sudden quarrel, in mutual combat, upon sudden provocation, and that the provocation was more than

slight, then you cannot find the defendant, A. T. Reynolds, guilty of any higher offense than voluntary manslaughter, which is punishable by confinement in the penitentiary not less than one, nor more than five years."

[8] This brings us to defendant's instruction "M," which was refused, and is as follows:

"The court instructs the jury that proof of ill will against Edgar T. Reynolds some time prior to the killing, cannot be taken as any evidence of malice or ill will against Alvis J. Reynolds, unless there is shown to be some connection between the trouble between A. T. Reynolds and Edgar T. Reynolds, and that between A. T. Reynolds and the deceased."

We do not perceive any good reason why this instruction should not have been given if the defendant so desired, but he was not prejudiced by the court's refusal to give it, for the reason that the evidence of the Commonwealth which, as conclusively shown by the verdict, was accepted by the jury as true, established a direct and immediate "connection between the trouble with A. T. Reynolds and Edgar T. Reynolds, and that between A. T. Reynolds and the deceased," so that the giving of the instruction would have been tantamount to telling the jury that the defendant's ill will towards his son Edgar ought to be taken into consideration as evidence of his malice in killing the deceased. The bad feeling between him and his son Edgar may have originated earlier, but the quarrel between them that day grew out of the game of cards. When the accused returned to the game after arming himself, it may be fairly said that he appeared to be mad at the whole party, and soon afterwards exhibited his temper by a merciless attack on the mule. After the shooting he said that he had

just killed one son (calling him a vile name) and was ready to kill another, referring in this threat to Edgar.

The proposition of law relied upon in this connection by counsel for the defendant that as a general rule the malice of an accused person against some other than the one whom he subsequently kills is not admissible in evidence to prove his malice against the deceased, has no application to the facts of this particular case.

In *McKinney* v. *State*, 8 Tex. App. 626, it was held to be well settled that when the state of mind constitutes an essential part of the crime charged, testimony of such previous acts, conduct or declaration of the accused as tend to establish the state of mind is competent, notwithstanding they may constitute in law a distinct crime.  See also Whart. Cr. Ev. (10th ed.), sec. 40, p. 150; *State* v. *Deschamps*, 42 La. Ann. 567, 7 So. 703, 21 Am. St. Rep. 392; Whart. on Homicides, secs. 701, 702.

[9] In 8 Ency. Ev., p. 376, it is said:  "The circumstances directly leading up to the assault or homicide are admissible as evidence to prove or rebut malice though such evidence may tend to prove the commission of a distinct offense.  So also evidence of an assault immediately after an assault or homicide upon another member of the family or party of the person assaulted, or upon one offering him assistance, is admissible to prove the maliciousness of the original act."

Again in 8 Ency. Ev., p. 378, it is said:  "Malice against a particular person cannot be proved ordinarily by malicious acts or conduct against another, even if the other be a member of the same family, but it may be proved by evidence of hostility or ill will against the entire family, or against the faction, class or race of which the particular person is a member."   See also *Killins* v. *State*, 28 Fla. 313, 334, 9 So. 711; *Denson* v. *State* (Tex. Cr. App.), 35 S. W. 150.

In *State* v. *Gainor*, 84 Ia. 209, 50 N. W. 947, it was held that the declaration by the accused, after he had killed a policeman and had gone to the hotel where he lived, that he had killed one policeman and wished he had killed another, was competent evidence as showing his feelings towards the deceased at the time the homicide was committed.

In the light of these authorities and of the evidence in this case, which the jury manifestly accepted as true (and to which evidence their belief could not have been influenced by the instruction in question), they must have believed that the anger and malicious state of mind existing on the part of the accused towards his son Edgar was directly connected with and was operating at the time of the homicide. He was, therefore, better off without the instruction than he would have been if the court had given it.

[10] The next assignment of error is based upon the refusal of the trial court to sustain the objection of counsel for the defendant and to a part of the argument made to the jury by the attorney for the Commonwealth. The language complained of was as follows: "In the eyes of the law, if I arm myself with a pistol to kill one special individual, and I go and kill another and different person, I am just as guilty as if I had killed the person I first got the pistol to kill; and when the defendant here, Anthony Reynolds, went to that house and got his pistol for Edgar Reynolds to kill him with, and afterwards killed Alvis Reynolds, under the circumstances claimed to be established by the evidence, with it, he is guilty of malice towards the deceased, Alvis Reynolds."

It follows from what we have said in connection with the refusal of instruction "M," that there was no error in refusing to exclude this argument from the jury.

The first part of it, as quoted, was not an accurate statement of law, but as a whole the argument was substantially correct in principle and was supported by the law and the evidence.

The only remaining assignment of error insisted upon is that the court refused to set aside the verdict on the ground that it was contrary to the law and the evidence.  It follows from what has been said in the course of this opinion that this assignment must be overruled.

The judgment complained of is affirmed.

*Affirmed.*