COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Judges Raphael, Lorish and Frucci
Argued at Arlington, Virginia


MEGAN HARGAN

MEMORANDUM OPINION* BY
v.      Record No. 0344-24-4         JUDGE STEVEN C. FRUCCI
SEPTEMBER 9, 2025

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Brett A. Kassabian, Judge

Bryan T. Kennedy, Senior Assistant Public Defender (Andrew
Elders, Deputy Public Defender, on briefs), for appellant.

Matthew J. Beyrau, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


Following a jury trial, the Circuit Court of Fairfax County convicted Megan Hargan of

two counts of first-degree murder and two counts of use of a firearm in the commission of a

felony. Hargan asserts that the circuit court erred in finding that the evidence was sufficient to

support her convictions. For the reasons stated below, we affirm the circuit court's judgment.

BACKGROUND

"Consistent with the standard of review when a criminal appellant challenges the

sufficiency of the evidence, we recite the evidence below 'in the "light most favorable" to the

Commonwealth, the prevailing party in the trial court.'" *Hammer v. Commonwealth*, 74

Va. App. 225, 231 (2022) (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)). This

standard "requires us to 'discard the evidence of the accused in conflict with that of the

Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and

---

* This opinion is not designated for publication. *See* Code § 17.1-413(A).

all fair inferences to be drawn therefrom.'" *Cady*, 300 Va. at 329 (quoting *Commonwealth v. Perkins*, 295 Va. 323, 324 (2018)).

In the summer of 2016, H.H. met Carlos Gutierrez in Dallas, Texas.[1] In 2017, they were living together in a house owned by H.H.'s mother, P.H., and the two were contemplating marriage. However, in the spring or early summer of 2017, P.H. sold her Texas home and H.H. returned to Virginia to reside with P.H., Hargan (who was H.H's sister), and Hargan's daughter M.H.[2] While Gutierrez remained in Texas, he and H.H. contacted each other daily. During this time, H.H. was awaiting the completion of construction on a new home that P.H. was having built for her in Virginia.

At 9:37 a.m. on July 14, 2017 ("July 14"), H.H. sent Gutierrez a text message asking him to call her and saying she loved him. During an initial call, H.H.'s voice seemed normal, but in a subsequent phone call at around 11:30 a.m., H.H. was "freaking out," crying, and seemed scared. In a hushed tone of voice, H.H. told Gutierrez that Hargan shot P.H. During the call, H.H. was situated in an upstairs bedroom, but through the cracked open door she could hear a "gurgling noise" coming from P.H. downstairs. H.H. explained that P.H. caught Hargan in "some kind of escort service deal" and threatened to seek custody of M.H. H.H. told Gutierrez that Hargan was downstairs in the study transferring money on the computer. She said she was afraid to call the police because Hargan might "freak out" and H.H. didn't want M.H. to see anything. Gutierrez and H.H. then exchanged several additional phone calls. During one of those calls, Gutierrez noticed that H.H. stopped crying and tried to speak in a more normal tone of voice with an adult

---

[1] We use initials, rather than names, to protect the privacy of the victims and minors mentioned throughout this opinion.

[2] Hargan was married to Frank Gyovai, Jr., but she and M.H. lived with P.H. because Gyovai was in the military and frequently deployed overseas.

woman who was in the house with her.[3]  During their final phone call at 12:42 p.m., H.H. instructed Gutierrez not to call the police and stated that she would try to get M.H. out of the house.

After their last call, Gutierrez received a number of text messages from H.H.'s phone that did not appear to be written by H.H.  Confused, Gutierrez kept calling her without any response. He didn't know the exact number of times he called, "but it was a lot."  At 1:23 p.m., Hargan answered H.H.'s phone and calmly told Gutierrez that H.H. and P.H. were "fighting [downstairs] in the study about a ticket that [H.H.] had received."[4]  She inquired as to why Gutierrez kept calling and refused to give H.H. the phone.  While they spoke, Gutierrez felt confused when Hargan told him that H.H. "had [just] held her hand up and told [Hargan] to hold on," as if they were all in the study together, but then refused to give H.H. the phone because H.H. was "downstairs."  Gutierrez asked Hargan to go put the phone in the study so he could hear them, but Hargan said she wasn't going to do that and hung up.  Gutierrez called 911.

At around 2:00 p.m. on July 14, Fairfax County police officers arrived at P.H.'s residence to conduct a welfare check at that location.  When no one answered the door, and after canvassing the outside of the house, the responding officers created a "breach team" and used a battering ram to break through the front door.  While walking through the residence, Officer Brooks Gillingham observed P.H.'s deceased body lying face down on the floor in a pool of blood near the kitchen.  A blanket covered her upper torso and head.  Officer Gillingham then found H.H.'s deceased body in an upstairs bathroom.  H.H.'s body was "sitting on [the] toilet"

---

[3] Though believed to be Hargan, Gutierrez had never spoken with Hargan, so he did not, at that time, recognize Hargan by voice.

[4] During a subsequent search of the house, a traffic ticket was discovered in a bedside table in H.H.'s bedroom.

and lying "backwards into the tub." A large .22 caliber rifle rested against the toilet between her legs.

Assistant Chief Medical Examiner Jocelyn Posthumus performed autopsies on P.H. and H.H. She later testified as an expert in forensic pathology. Dr. Posthumus testified that P.H. died from two separate rifle wounds to her head, one to her right temple and one to her "right parietal scalp, which is right behind the ear." A projectile was recovered directly underneath a contusion or bruise that was found on the frontal scalp. Dr. Posthumus retrieved bullet fragments from inside P.H.'s head, packaged them up, and gave them to Fairfax police. She concluded that P.H. died as a result of the two bullet wounds to her head, either of which might have killed her.

The autopsy report showed that H.H. died of a single rifle wound to the head. Because there was soot surrounding the entrance wound, Dr. Posthumus believed that the gun was fired at close range. The wound was on H.H.'s left frontal scalp, just beyond the hairline. Dr. Posthumus testified that the "missile path" had a "striking downward trajectory. It was also rightward, and then slightly backward." Dr. Posthumus recovered the projectile from "deep within the right side of [H.H.'s] neck." She also noted a small, postmortem abrasion or "blunt force" injury to H.H.'s pubic area. The location of the injury—on the left side of H.H.'s mons pubis—was in the vicinity where the rifle was found resting against her body.

Dr. Posthumus opined that H.H. did not die instantly from the wound; her lungs showed evidence of hemoaspiration, meaning that she had breathed in blood that had seeped out from the rifle wound in her head. There was also blood in H.H.'s stomach, indicating she had swallowed it. According to Dr. Posthumus, it was possible that H.H. had retained the ability to perform purposeful movement after she was shot, but it was also possible that she became immediately unconscious, but not yet dead. Dr. Posthumus collected a DNA sample and other bodily fluids

from both bodies and then tested P.H. and H.H. for gunshot residue. She later gave those items to the Fairfax Police Department for further investigation.

Forensic Scientist Bonnie Lo tested the samples of blood and body fluids. H.H.'s blood was positive only for the presence of marijuana. H.H.'s blood contained a concentration of .0010 milligram per liter of THC and a concentration of less than .0050 milligram per liter of carboxylic acid. Lo's supervisor, Forensic Toxicologist Carol O'Neal, testified that the very small amount of marijuana in H.H.'s blood was unlikely to cause aggressive or suicidal behavior and would have a minimal effect on a person's judgment, perception, and behavior. No illicit drugs or alcohol were detected in P.H.'s blood.

Fairfax Police Detective Silvana Barreto met with Hargan at around 8:10 p.m. on July 14 at the home of Hargan's father in Sterling, Virginia. While there, Detective Barreto collected Hargan's clothing and used a primer residue kit to test Hargan's hands for gun residue.[5]

Fairfax Police Detective Julia Elliott processed the crime scene and collected evidence. There was no evidence of forced entry into P.H.'s home. Among the items collected were a .22 caliber Ruger 96 lever action rifle recovered from the bathroom where H.H.'s body was found, a cartridge case that was found in the rifle's chamber, a magazine for the rifle, a .22 caliber cartridge case that "was folded amongst the comforter" draped over P.H.'s body, and an "unspent bullet" on the staircase leading from the kitchen area to the basement room. Detective Elliott later collected samples of Hargan's DNA and ran her fingerprints. She also collected swabs from the door handles of H.H.'s Jeep, which was still in the driveway at P.H.'s house. A soft sided rifle case was found in the back seat. Detective Elliott later transported all of this evidence to DFS for analysis.

---

[5] Hargan voluntarily agreed to the gun residue test and agreed to give Detective Barreto her pants, a shirt, and a brasserie. Detective Barreto did not know if Hargan had been wearing those items of clothing earlier in the day.

Detective Elliott testified that H.H.'s cell phone was found on the bathroom sink, near her deceased body. To Detective Elliott it appeared as though "someone had taken the screen and wiped it off from one side to the other," because there "were visible wipe marks." P.H.'s cell phone was found lying in the blood, next to her on the floor in the room where her body was found. Detective Elliott also took photos of the downstairs office. One of the photographs depicted a purse with P.H.'s wallet in it sitting on the floor with a spreadsheet on top of it.[6] Detective Elliott photographed the spreadsheet but did not collect it. Another photograph captured P.H.'s ASUS laptop computer sitting on the desk in front of a desktop computer. Detective Elliott did not collect the laptop because she did not think it was of any evidentiary value. In the basement, behind some photo albums on a bookshelf, Detective Elliott found a Bank of America statement for Hargan, a Capital One bank statement for P.H., a test page for a wireless printer,[7] and a copy of the same spreadsheet that was on top of P.H.'s purse in the office.

Detective Elliott searched the house both on the day of the deaths and again "roughly four to five days later." Between that time, Hargan had access to the house. When Detective Elliott returned the second time, the ASUS laptop, the spreadsheet found on top of P.H.'s purse, and the documents behind the photo albums in the basement were gone.

Forensic Scientist Bronwyn McMaster testified as an expert in forensic firearm and ammunition examination and comparison. McMaster testified the cartridge casing found at the scene and the bullet fragments recovered from the bodies of P.H. and H.H. during their autopsies were fired from the rifle that was in the bathroom where H.H.'s body was found.

---

[6] The passwords to P.H.'s bank accounts were written on the spreadsheet.

[7] A wireless printer was found in Hargan's bedroom at P.H.'s house.

Forensic Scientist Douglas Degaetano testified as an expert in the detection and analysis of trace evidence, including primer residue. Degaetano testified that there are several ways to get primer residue on one's hands: if primer residue is on someone's hands, it is either because the person fired a weapon, they were in proximity to the discharge of the weapon, they handled a previously fired weapon, or they came into contact with an item that had primer residue on it. Degaetano testified that gun primer residue typically remains on a person who fired the gun for four to six hours after the weapon is discharged. Degaetano tested the gun residue kits that were submitted for P.H., H.H., and Hargan and found that Hargan had primer residue on both hands. He added that the primer residue on Hargan's hands appeared to be consistent with residue from a .22 caliber rifle and from "another source, which is a large[r] caliber." There was no evidence of primer residue on P.H.'s hands, but H.H. had primer residue on her right hand.

Forensic Scientist Shiao-Mei Smith testified as an expert in forensic biology and DNA analysis. Smith developed a DNA profile on the strap of the gun case that was found in H.H.'s Jeep. The profile was a mixture of two contributors; a major contributor and a minor contributor. The major contributor was a male, but Hargan could not be eliminated as a minor contributor. H.H. and P.H. were both eliminated as contributors to the profile. Smith also developed a single source DNA profile from the barrel of the rifle found near H.H.'s body. H.H. and Hargan were eliminated as contributors to that profile, but P.H. was not. Smith found a DNA profile on the "muzzle end" of the rifle. P.H. and Hargan were eliminated as contributors to that profile, but H.H. was not. Smith developed a single source DNA profile from the "fore-end" of the rifle. Hargan and H.H. were eliminated as contributors to that profile, but P.H. was not. Smith next recovered a DNA profile mixture from the "edges of the trigger" and the "trigger guard and handle." Hargan and H.H. were eliminated as possible contributors to that profile. Smith did not draw a conclusion with respect to P.H. Finally, Smith developed a mixture profile from the heel

of the rifle. Smith identified H.H. as the major contributor to that mixture, but she could not determine the identity of the minor contributor.

At the time of the deaths, Lois Lawlor was assisting P.H. with the purchase of a home for H.H. in Aldie, Virginia. While the house was being built, P.H. regularly consulted Lawlor and sometimes H.H. accompanied P.H. to their meetings. P.H. had already placed an earnest money deposit on the house, which was in the company's escrow account. Lawlor explained that to cancel the sale of the house, P.H. would have had to notify her and she would have had to generate a termination of agreement form. Nothing suggested that P.H. wanted to terminate their agreement before she died and, in fact, she had scheduled an appointment with the company's home gallery to discuss some finishing touches.

Gayla Adrian lists and sells real estate for Caldwell Banker. She testified that Hargan and her husband, Frank Gyovai, Jr., wanted to buy a house located in Morgantown, West Virginia. The house was listed for $418,500. In June 2017, Hargan told Adrian that she and Gyovai intended to purchase the property with cash. Adrian normally communicated with Hargan and Gyovai through emails, and she testified that she received a proof of funds document from Hargan in June 2017 indicating that Hargan had $613,212.92 in a bank account at Capital One Bank.[8] Adrian testified that she had never met P.H. and that P.H. was not involved in the purchase. The closing on Hargan and Gyovai's new house was scheduled for July 14. On that day, Adrian met only with Gyovai. During their meeting, Gyovai received a call from Hargan verifying that she was getting a wire transfer to go through for the closing. Adrian heard Hargan through the phone saying that she was having trouble getting the wire transfer to go through. The wire transfer did not go through.

---

[8] The statement showed signs of alteration to include Hargan's name and address.

Scott Green managed the wire fraud prevention team at Capital One Bank. According to Green, as of June 7, 2017, P.H.'s total balance--between her high yield checking account and her essential savings account--was $613,212.92. Hargan's name was not on P.H.'s account, but Green testified that Hargan also had an account at Capital One Bank. Bank statements detailing Hargan's balances on May 31, 2017, June 30, 2017, and July 31, 2017, were admitted at trial. The bank statements showed that she had $5 in her account on May 31, she had a negative $24 balance in her account on June 30, 2017, and she had $10 in her account on July 31. According to Green, Hargan did not have any other accounts at Capital One. The evidence showed that Hargan also had an account at Bank of America. Those bank records showed that Hargan had $30.80 in her account on June 12, 2017, $443.20 in her account on July 11, 2017, and $60.55 in her account on August 11, 2017.

Green testified that Capital One received a series of phone calls between July 13 and July 14, 2017.[9] The phone calls revealed that on July 13, 2017, at 9:35 a.m., Hargan, pretending to be P.H., attempted to wire $419,034.77 from P.H.'s Capital One Account to a title company in West Virginia for the purchase of the house she and Gyovai were buying. The customer service agent initiated the wire transfer and told Hargan she would receive a confirmation call from Capital One within the hour. The agent also told Hargan that she could view the completed wire transfer by signing on to her bank account online. Hargan specifically asked that the confirmation call be made to P.H.'s landline and gave the agent that phone number. However, at 10:40 a.m., Felix[10] from Capital One called P.H. on her cell phone to confirm the wire transfer. That call lasted 14 minutes and 53 seconds. P.H., who was driving to Pennsylvania to have lunch with her third

_____

[9] The recorded phone calls were admitted into evidence and played for the jury at trial.

[10] Felix did not provide his last name.

daughter, was shocked to learn of the transfer request and asked that her accounts be frozen. She did not authorize the transfer.

On July 14, Hargan again attempted to wire $418,826 in cash to her title company from P.H.'s Capital One bank account. The recorded call occurred at 11:45 a.m., just 14 minutes after H.H. told Gutierrez that Hargan had shot P.H. This time, Hargan provided P.H.'s cell phone number for the confirmation call. During the call, Hargan was put on hold for about six minutes. During that time, P.H.'s cell phone records showed that her phone received an incoming call from Hargan's phone and that her phone rang for 11 seconds. At around 11:57 a.m., the customer service agent came back on the line and told Hargan that the transfer request was complete, that she would receive a verification call, and that Capital One would need to speak with her before the wire went out. At 12:38 p.m., Felix from Capital One again called P.H.'s cell phone to verify the wire transfer.

Nickolas Boffi was a digital forensics detective who extracted cell phone data from Hargan's phone and the ASUS laptop computer. From the computer Detective Boffi extracted an artifact of a web cache ("cache"). The cache showed that at 10:14 a.m. on July 14, P.H.'s username accessed an account at CapitalOne.com. P.H.'s username also accessed the account at 11:28 a.m., noon, 12:10, 12:12, 12:24, 12:39, 12:43, 12:58, and 1:18 p.m. However, Capital One never wired the money.

Fairfax Police Crime Analyst Jennifer Harrington testified as an expert in historical cell phone and cell tower analysis. Harrington analyzed the phone records and cell tower information for H.H., P.H., and Hargan's phones between July 13 and 17, 2017. Hargan's phone records showed that she called Gyovai at 9:41 a.m. on July 13, 2017. She also called Gyovai at 10:06 and 11:58 a.m. on July 14. An additional call from Hargan's phone to Gyovai occurred at around 1:18 p.m. on July 14 and lasted 6 minutes.

Calls from H.H.'s phone to Gutierrez were recorded at 10:47, 11:27, and 11:31 a.m. on July 14, but only the call made at 11:31 a.m. was answered. That call lasted 11 minutes and 23 seconds. The data showed a phone call from H.H. to Gutierrez at 11:44 a.m., which was not answered, and that Gutierrez immediately returned H.H.'s call and spoke to her for 15 minutes and 43 seconds. Another call from H.H. to Gutierrez occurred again at 12:09 p.m. and lasted 7 minutes and 43 seconds. At 12:42 p.m. a call was made from H.H.'s phone to Gutierrez that lasted 3 minutes and 25 seconds. A call from H.H.'s phone to Dogwood Tavern in Falls Church occurred at 1:12 p.m. and lasted 49 seconds. One final phone call lasting 9 minutes and 54 seconds was recorded coming from Gutierrez's phone to H.H.'s phone at 1:23 p.m. There were no more phone calls recorded from H.H.'s phone that day, and all additional calls from Gutierrez to H.H. went unanswered.

H.H. often visited the Dogwood Tavern. Sam Saslowsky worked there, and the two became friends. Saslowksy described H.H. as "highly amicable . . . personable, bubbly, [and] outgoing." He heard H.H. talk "at least once a week if not more," so he had a "high level of familiarity," with the sound of her voice. Saslowksy testified that he received a phone call on July 14 from a person claiming to be H.H. He did not recognize the person's voice as H.H.'s, and he found it odd that she was trying to "call out of work" that day because H.H. did not work there. In actuality, H.H. worked at Dogfish Head Ale House in Falls Church. Dogfish's Assistant Manager Jorge Blanco Hernandez testified that while H.H. was indeed scheduled to work on July 14, she did not appear for work and she did not call out.

Hargan's phone records showed that Hargan's phone was at P.H.'s house on July 14 until 1:42 p.m. Jason Johnson, P.H.'s neighbor across the street, had security cameras at his house that captured Hargan's black minivan driving past his house at 1:42 p.m. that day. Her cell phone then pinged a different cell phone tower at 1:51 p.m., which suggested that she was

- 11 -

moving away from P.H.'s residence. From there, she drove through Virginia and traveled along the Beltway in a northerly direction.

On the morning of July 17, 2025, Fairfax County Police Detective Brian Byerson received a call from Capital One's fraud department. The fraud department provided Detective Byerson the recordings of the concerning phone calls it had received on July 13 and 14. After listening to the recordings, Detective Byerson spoke with Hargan via telephone. That phone call was recorded and played for the jury at trial. During the phone call, Hargan referenced 911 calls she made on July 13, 2017, in which she had reported that two suspicious men were walking up and down the street in front of P.H.'s house and appeared to be taking notes. During the second 911 call, she had reported that the same men drove by the house in a black Dodge Ram pickup truck. Hargan told Detective Byerson that P.H. agreed to buy a house for her and Gyovai and that P.H. had requested the wire transfers from Capital One to the title company. She said she did not have the passwords to P.H. or H.H.'s phones, but she knew both phones could be unlocked with their fingerprints. She also told Detective Byerson that P.H. did not approve of Gutierrez, because P.H. believed that H.H. had been using heroin since meeting Gutierrez.

Detective Byerson again interviewed Hargan on July 19, 2017. During that conversation, Detective Byerson mentioned the recordings he had received from the Capital One fraud department and explained that someone had attempted Capital One wire transfers of "a significant amount of money" on July 13 and 14 using P.H.'s name and account. At first, Hargan maintained that she did not make those calls, but after he played the recordings for her, she admitted that she made them. Hargan also admitted she was at P.H.'s house on the day of the murders and did not leave until 1:42 p.m. She insisted that P.H. and H.H. were alive when she left the house. Though she said she brought the rifle in the house and placed it under the couch the day before P.H.'s and H.H.'s deaths, she denied that she fired the rifle that day.

- 12 -

Hargan suggested that H.H. was the culprit due to problems stemming from her illegal drug use and bouts with depression.

In November 2018, Fairfax County Police Detective Olan Faulk executed a search warrant at Hargan and Gyovai's house in Morgantown, West Virginia. From a suitcase in a room off the garage, Detective Faulk recovered the laptop computer and the spreadsheet that had gone missing from P.H.'s house in July 2017.

After the Commonwealth rested its case, Hargan moved to strike the evidence. Hargan asserted that the evidence failed to prove she murdered P.H. or H.H. and argued that, instead, the evidence proved that H.H. killed P.H. and then committed suicide. Finding that Hargan's challenge to the sufficiency of the evidence should be resolved by the jury, the circuit court denied the motion to strike. After presenting evidence, Hargan rested her case and renewed her motion to strike on the same grounds. The circuit court denied the renewed motion to strike. Following closing arguments, jury instructions, and deliberation, the jury convicted Hargan on two counts of first-degree murder and two counts of using a firearm in the commission of murder. Hargan appeals.

## ANALYSIS

"When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (alteration in original) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Id.* (alteration in original) (quoting *Secret v. Commonwealth*, 296 Va. 204, 228 (2018)). "Rather, the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016) (quoting

*Williams v. Commonwealth*, 278 Va. 190, 193 (2009)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *McGowan*, 72 Va. App. at 521 (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)).

"First-degree murder is defined as a malicious killing accomplished by a willful, deliberate, and premeditated act." *Turner v. Commonwealth*, 23 Va. App. 270, 274 (1996), *aff'd*, 255 Va. 1 (1997); Code § 18.2-32. "Premeditated murder . . . contemplates: (1) a killing; (2) a reasoning process antecedent to the act of killing, resulting in the formation of a specific intent to kill; and (3) the performance of that act with malicious intent." *Fields v. Commonwealth*, 73 Va. App. 652, 674 (2021) (quoting *Rhodes v. Commonwealth*, 238 Va. 480, 486 (1989)). In this case, Hargan does not dispute a particular element of first-degree murder; rather she asserts that the evidence was insufficient to prove the corpus delicti of H.H.'s alleged murder and to disprove that H.H. could have been the one to kill P.H.

"The *corpus delicti* is a material fact to be established in every criminal prosecution." *Bowie v. Commonwealth*, 184 Va. 381, 389 (1945) (quoting *Nicholas v. Commonwealth*, 91 Va. 741, 750 (1895)). "The term 'means, literally, "the body of a crime"' and refers to 'the fact that the crime charged has been actually perpetrated.'" *Rams v. Commonwealth*, 70 Va. App. 12, 29 (2019) (quoting *Aldridge v. Commonwealth*, 44 Va. App. 618, 648 (2004)). "In other words, the prosecution must prove 'that the alleged offense was attributable to a criminal act, and not to mere accident or chance.'" *Id.* "As it relates to murder, 'the *corpus delicti* has two components—death as the result, and the criminal agency of another as the means.'" *Id.* (quoting *Nicholas*, 91 Va. at 750). "Virginia courts 'have long held that the *corpus delicti* may be proven by circumstantial evidence.'" *Id.* (quoting *Epperly v. Commonwealth*, 224 Va. 214, 229 (1982)). "Virginia law also provides that motive is among the types of circumstantial evidence that may be used to establish

both that a death was not the result of natural causes and that it was caused by the defendant." *Id.* at 30.

Similarly, it is well-settled that "[a]t trial, the Commonwealth bears the burden of proving the identity of the accused as the perpetrator beyond a reasonable doubt." *Cuffee v. Commonwealth*, 61 Va. App. 353, 364 (2013) (quoting *Blevins v. Commonwealth*, 40 Va. App. 412, 423 (2003)). Identity may be proved by direct or circumstantial evidence. *Crawley v. Commonwealth*, 29 Va. App. 372, 375 (1999). "Circumstantial evidence is as competent and is entitled to as much weight as direct evidence, provided it is sufficiently convincing to exclude every reasonable hypothesis except that of guilt." *Holloway v. Commonwealth*, 57 Va. App. 658, 665 (2011) (en banc) (quoting *Coleman v. Commonwealth*, 226 Va. 31, 53 (1983)). "[C]ircumstantial evidence is not viewed in isolation." *Id.* (quoting *Emerson v. Commonwealth*, 43 Va. App. 263, 277 (2004)). "While no single piece of evidence may be sufficient, the combined force of many concurrent and related circumstances . . . may lead a reasonable mind irresistibly to a conclusion." *Pijor v. Commonwealth*, 294 Va. 502, 512-13 (2017) (alteration in original) (quoting *Muhammad v. Commonwealth*, 269 Va. 451, 479 (2005)). Motive is "a circumstance tending to prove the guilt of the alleged perpetrator . . . . It is relevant and probative on the issue of identity of the criminal agent." *Cantrell v. Commonwealth*, 229 Va. 387, 397 (1985). Moreover, "[b]y finding the defendant guilty, . . . the factfinder 'has found by a process of elimination that the evidence does not contain a reasonable theory of innocence.'" *James v. Commonwealth*, 53 Va. App. 671, 681 (2009) (quoting *Haskins v. Commonwealth*, 44 Va. App. 1, 9 (2004)). That conclusion "is itself a 'question of fact,' subject to deferential appellate review." *Id.*

In this case, the facts and circumstances of the offenses, together with all reasonable inferences arising therefrom, were sufficient for a reasonable fact finder to conclude beyond a reasonable doubt that Hargan shot and killed both P.H. and H.H. The evidence showed that in the

months before the deaths, Hargan and Gyovai found a home in West Virginia that they wanted to purchase with cash. While Hargan's June and July 2017 bank statements at both Capital One and Bank of America indicated that she did not have sufficient funds to cover the purchase price, she nevertheless sent Adrian a bank statement from Capital One showing sufficient funds in an account to cover the nearly $419,000 price of the home. That statement showed the amount in P.H.'s bank account and had been altered to provide Hargan's name and address.

The evidence also showed that from P.H.'s home office at 9:35 a.m. on July 13, 2017, Hargan called Capital One and, over the phone, attempted to wire money to her closing agent in West Virginia. The recorded phone calls captured Hargan pretending to be P.H., who at that time was driving to Pennsylvania to have lunch with her third daughter. The funds did not go through that day because the bank called P.H. on her cell phone rather than her landline, as Hargan had requested, to verify the transfer. P.H. was shocked by the information that someone was trying to transfer money and emphatically stated that her accounts were not to be touched. The record shows that, while Hargan waited for the verification call that never came, she called 911 twice to report two suspicious men on P.H.'s street. She described the men and reported that P.H. asked her to call about them because "someone" had fraudulently accessed P.H.'s account that morning.[11]

On July 14, cell phone data and telephone recordings revealed that at 11:45 a.m., Hargan called Capital One and, again pretending to be P.H., attempted to wire the funds for the sale of the house. This time, she gave Capital One P.H.'s cell phone number as the call back number for the verification call. Hargan then called P.H.'s cell phone and let it ring for 11 seconds. It was reasonable to infer from that fact that Hargan called P.H.'s phone in order to retrieve it for the return call. Also, around this time, someone repeatedly checked P.H.'s bank account online. The Capital

---

[11] During the second 911 call, the operator told Hargan that police had already checked the area in response to Hargan's first call and saw no one matching the description of the men.

One operator had told Hargan she would be able to verify the transfer of money that way. A reasonable inference from this evidence is that Hargan repeatedly checked P.H.'s bank account to see if the funds were transferred. Overall, this evidence allows a reasonable fact finder to conclude that Hargan had motive to kill P.H. to obtain funds for the Morgantown, WV, house.

The evidence also supported their conclusion that Hargan killed H.H. On July 14, phone records revealed that Gutierrez and H.H. exchanged several phone calls that morning. During one such call, H.H. told him that Hargan shot P.H. and that she had heard Hargan and P.H. previously arguing. H.H. explained to Gutierrez that she did not want to call 911 or leave the house without first ensuring that M.H. was safe. During another call, she told Gutierrez that Hargan was downstairs in the office transferring money. Soon after, Gutierrez received numerous text messages from H.H.'s cell phone that did not sound like H.H. Hargan then was the one to answer H.H.'s cell phone and speak to him for about 9 minutes at 1:23 p.m. During that phone call, Hargan gave several reasons why H.H. could not come to the phone and then abruptly hung up on him. A suspicious call was also made to the Dogwood Tavern where someone, pretending to be H.H., called off work, even though H.H. did not work there.

Physical evidence at the crime scene also supported the jury's conclusion that Hargan committed the murders of P.H. and H.H. The evidence showed that P.H. was shot twice in the head with the same .22 caliber rifle used to kill H.H. By her own admission, Hargan brought the rifle to the house on July 13, 2017, and unbeknownst to P.H. and H.H., hid it there. After an argument occurred between P.H. and Hargan on July 14, P.H. was shot twice in the head and H.H., who heard the argument and reported to Gutierrez that Hargan shot P.H., was thereafter shot at point blank

range.[12] The gunshot was pointed at the top of H.H.'s head, entered H.H.'s skull near her hair line, traveled in a slightly downwardly direction, and ultimately landed in her throat. Her body was draped backward over the toilet with her arms hanging limp to the ground and her head resting on the edge of the bathtub. The rifle was propped up against the toilet between her legs, having been pushed into her mons pubis so hard that she sustained a postmortem injury to that area of her body. H.H.'s phone was found wiped clean of fingerprints. Less than eight hours after the murders, Hargan had gunshot residue on her hands consistent with having fired a .22 caliber weapon. Her DNA was also on the straps to the gun case recovered from H.H.'s Jeep. Days later, the spreadsheet with P.H.'s passwords to her bank account and the modified bank statement Hargan created went missing from the house, along with the laptop computer used to access Capital One online on the morning of the murders. Those items were found in Hargan's West Virginia house in 2018.[13]

Hargan argues, and we acknowledge, that "[p]roof by circumstantial evidence 'is not sufficient . . . if it engenders only a suspicion or even a probability of guilt. Conviction cannot rest upon conjecture." *Betancourt v. Commonwealth*, 26 Va. App. 363, 373 (1998) (quoting *Littlejohn v. Commonwealth*, 24 Va. App. 401, 414 (1997)). Indeed, "[a]ll necessary circumstances proved must be consistent with guilt and inconsistent with innocence and exclude every reasonable hypothesis of innocence." *Id.* (quoting *Stover v. Commonwealth*, 222 Va. 618, 623 (1981)). "When, from the circumstantial evidence, 'it is just as likely, if not more likely,' that a 'reasonable hypothesis of innocence' explains the accused's conduct, the evidence cannot be said to rise to the level of proof beyond a reasonable doubt." *Littlejohn*, 24 Va. App. at 414 (quoting *Haywood v.*

---

[12] The Commonwealth argued in closing that Hargan likely killed H.H. between 12:43 and 12:58 or between 12:58 p.m. and 1:12 p.m., because the phone and computer records showed no phone activity or web traffic during those time frames.

[13] Gyovai ultimately took out a mortgage on a different house in the amount of $215,000, as the funds from P.H.'s bank account were never wired for the house Hargan and Gyovai wanted to purchase on the other house.

*Commonwealth*, 20 Va. App. 562, 567-68 (1995), *overruled in part for other reasons by Fary v. Commonwealth*, 77 Va. App. 331 (2023)). The Commonwealth need not "exclude every possible theory or surmise," but it must exclude those hypotheses "which flow from the evidence itself, and not from the imagination of defendant's counsel." *Cantrell v. Commonwealth*, 7 Va. App. 269, 289-90 (1988) (quoting *Black v. Commonwealth*, 222 Va. 838, 841 (1981)).

The jury's rejection of Hargan's hypothesis of innocence is not plainly wrong. The record does not support Hargan's claims that H.H. had a motive to murder P.H., that H.H. was depressed, that H.H. used illicit drugs, or that P.H. disapproved of Gutierrez. To begin with, those assertions only arise from Hargan in the statements she made to police. Saslowsky testified that H.H. was amicable, personable, bubbly, and outgoing. In her first text of the morning on July 14, H.H. stated that she loved Gutierrez and called him buttercup. The first person she called for support after learning that Hargan shot P.H. was Gutierrez. Moreover, during her phone call to Capital One on July 13, Hargan, pretending to be P.H., said that she was buying a house for her other daughter (i.e. H.H.) in three weeks, and the evidence showed that P.H. and H.H. had an appointment to pick out blinds for the house. No evidence was presented that P.H. intended to cancel the sale of H.H.'s house or that she disapproved of Gutierrez. So, the evidence did not support that H.H. had a motive to kill P.H.

Additionally, H.H.'s toxicology report belied that H.H. used illicit drugs. The only substance found in her system was an amount of THC so small that it fell within the lowest range tested by the Lab. Degaetano testified that the gunfire residue on H.H.'s hands was normal given her proximity to the weapon when it was fired. Yet the sheer length of the rifle, the location of the bullet hole near the top of H.H.'s head, the trajectory of the bullet in a downward direction, the location of the bullet in H.H.'s neck, the fact that the rifle came to rest between H.H.'s legs, the

postmortem injury to her pubic region, and the crime scene evidence, viewed in totality, belied any notion that H.H. used the rifle upon herself.

In any case, it is not essential that the Commonwealth eliminate every possible or conceivable alternative theory, no matter how remote. It must only exclude reasonable hypotheses of innocence that flow from the evidence, rather than any that may flow "from the imagination of defense counsel." *Goins v. Commonwealth*, 251 Va. 442, 467 (1996). In other words, we review "not whether 'there is some evidence to support' [appellant's] hypothesis," but "whether a reasonable jury, upon consideration of all the evidence, could have rejected [appellant's theory of suicide] and found [her] guilty of murder beyond a reasonable doubt." *Commonwealth v. Hudson*, 265 Va. 505, 513 (2003). We find no error in the jury's rejection of Hargan's hypothesis of innocence, as the record simply does not support it.

In sum, the record supports the jury's conclusion that Hargan, maliciously, willfully, deliberately, and with premeditation, murdered P.H. and H.H. The jury considered the totality of the evidence and properly rejected Hargan's hypothesis of innocence. Nothing in the record, other than the self-serving statements Hargan made to the police, supports the assertion that H.H. shot and killed P.H. and then committed suicide. Rather, the totality of the evidence could lead any reasonable fact to conclude beyond a reasonable doubt that Hargan committed the murders.

CONCLUSION

Accordingly, we affirm the circuit court's judgment and leave the guilty verdicts undisturbed.

*Affirmed.*